**THIRD DIVISION**
**BARNES, P. J.,**
**MCFADDEN, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 9, 2017**

# In the Court of Appeals of Georgia

A16A2069, A16A2070. CAMELOT CLUB CONDOMINIUM ASSOCIATION, INC. v. AFARI-OPOKU et al.; and vice versa.

MCMILLIAN, Judge.

After Emmanuel Afari-Opoku[1] was murdered in the parking lot of his gated community, his surviving spouse Georgina Afari-Opoku sued the condominium complex and the security firm that it hired for negligence in failing to keep the premises safe. The matter proceeded to trial against Camelot Club Condominium

---

[1] The last name of Georgina and her deceased husband Emmanuel is actually Opoku-Afari, and not Afari-Opoku. However, the complaint in this case originally identified the Appellee/Cross-Appellant and her husband as Georgina and Emmanuel Afari-Opoku. Although the trial court signed an order on October 27, 2014 to correct this misnomer and to change the style of this case to reflect the plaintiff's true name, the parties did not adopt this change in their subsequent filings in the trial court or in this Court. Accordingly, we will use the misnomer in this opinion for consistency, and to avoid any confusion we respectfully refer to the Appellee/Cross-Appellant and her husband by their first names.

Association, Inc. ("Camelot"), and Alliance Security & Protective Services, LLC ("Alliance"), and a jury found that Georgina, as the surviving spouse of and as personal representative of Emanuel's estate, had suffered $3,250,000 in damages arising from her husband's wrongful death. The jury apportioned 25% of the fault for Emmanuel's death against Camelot, 25% against Alliance, and the remainder against non-parties Anthony Norris (15%), Tariq Smith (15%), and Tefflon Rhoden (20%) (referred to collectively herein as the "Assailants"). The parties subsequently filed post-trial motions and briefs addressing the issue of apportionment between Camelot and Alliance. Following a hearing, the trial court issued judgment in the amount of $1,625,000 against Camelot, which "constitute[d] the 25% fault the jury assigned to Camelot plus the 25% fault the jury assigned to Alliance," and the amount of $812,500 against Alliance representing the 25% fault the jury assigned to it.

In Case No. A16A2069, Camelot appeals the trial court's denial of its motion for directed verdict at trial, as well as the trial court's judgment finding Camelot liable for Alliance's share of fault. In Case No. A16A2070, Georgina cross-appeals the trial court's denial of her pretrial motion in limine to preclude Camelot from arguing that it is not legally responsible for the conduct of Alliance and its security guard employee, and further appeals the denial of her trial motion to "disallow any

apportionment [by the jury] of fault, liability or damages between Alliance [] and Camelot."

Construed in support of the jury's verdict,[2] the record shows that Camelot is the owner of the common areas of the Camelot Club Condominiums in College Park ("Camelot Club"). Beginning in 2009, the Camelot board became concerned about the level of crime in and around the gated community and began to take measures to increase security. In August 2010, the board hired Alliance to provide 24/7 security at the front gate.

On October 12, 2010, Emmanuel, a Camelot Club resident, purchased electronics from Smith in a parking lot on Campbellton Road. After the transaction, Smith and a companion contacted Norris and Rhoden regarding Emmanuel, and the three met up in the parking lot. Although Norris suggested robbing Emmanuel there, the three men decided to follow him instead. Emmanuel stopped at a gas station on his way home, and the Assailants stopped in a parking lot across the street. They discussed robbing Emmanuel at this location and taking his car, but they opted to follow him home. After trailing Emmanuel for around 20 miles, they arrived at

---

[2] See *Harris v. Tutt*, 306 Ga. App. 377, 378 (1) (702 SE2d 707) (2010) (on appeal, evidence must be construed to uphold the verdict).

Camelot Club. There, the security guard let them in, allowing their car to drive through the security gates and the security arm without questioning them. The men followed Emmanuel to his condominium unit, and during an attempt to rob him, Rhoden shot Emmanuel, who later died from his injuries.

Georgina filed suit against Alliance[3] and "ABC Corporation" on February 25, 2012, alleging that they had undertaken and breached a duty to provide security for the residents and invitees of Camelot Club. She subsequently amended the complaint to replace "ABC Corporation" with Camelot and Homeside Properties, Inc.[4] as named defendants, and to spell out claims for negligence under OCGA § 51-3-1 and the Restatement of Torts (Second) § 324A and nuisance under OCGA § 41-1-1 et seq.

*Directed Verdict*

1. Camelot argues that the trial court erred in denying its motion for directed verdict because the evidence showed that Camelot did not breach any duty to Emmanuel and no evidence existed that it had created a nuisance on the property.[5]

---

[3] Alliance did not participate in the litigation of the case or the trial.

[4] Georgina settled her claims against Homeside Properties, Inc. Neither Homeside Properties nor Alliance are parties to this appeal.

[5] Georgina asserts that Camelot waived its appellate arguments regarding the denial of its motion for directed verdict because it did not assert the same arguments

4

"The standard of appellate review of a trial court's denial of a motion for a directed verdict is the any evidence test." (Citation and punctuation omitted.) *Doherty v. Brown*, 339 Ga. App. 567, 573 (2) (794 SE2d 217) (2016). Moreover, "[i]n considering a ruling on a motion for directed verdict, the evidence must be construed most favorably to the party opposing the motion." (Citation and punctuation omitted.) *Chrysler Group, LLC v. Walden*, 339 Ga. App. 733, 735-36 (1) (792 SE2d 754) (2016). We review any pure questions of law de novo. *Brown v. Tucker*, 337 Ga. App. 704, 720 (8) (788 SE2d 810) (2016).

(a) *Premises Liability* – Camelot asserts that Georgina failed to show that it breached any duty under OCGA § 51-3-1, because the evidence does not demonstrate that the crime in this case was forseeable or that Camelot had superior knowledge of the risk that caused Emmanuel's death.

Under OCGA § 51-3-1,

> [w]here an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.

---

at trial in support of the motion. We find no waiver.

5

"Although a landowner has a duty to invitees to exercise ordinary care to keep its premises safe . . . , the landowner is not an insurer of an invitee's safety." *Agnes Scott College v. Clark*, 273 Ga. App. 619, 621 (1) (616 SE2d 468) (2005). See also *Sipple v. Newman*, 313 Ga. App. 688, 690 (722 SE2d 348) (2012). In order to recover on a premises liability claim, a plaintiff must show "(1) that the defendant had actual or constructive knowledge of the hazard; and (2) that the plaintiff lacked knowledge of the hazard despite the exercise of ordinary care due to actions or conditions within the control of the owner/occupier." *Robinson v. Kroger Co.*, 268 Ga. 735, 748-49 (2) (b) (493 SE2d 403) (1997).

(i) *Foreseeability* – An intervening criminal act by a third party generally "insulates a landowner from liability unless such criminal act was reasonably foreseeable." *Clark*, 273 Ga. App. at 621 (1). See also *Days Inns of America v. Matt*, 265 Ga. 235, 236 (454 SE2d 507) (1995) ("Simply put, without foreseeability that a criminal act will occur, no duty on the part of the proprietor to exercise ordinary care to prevent that act arises."). "In order to be reasonably foreseeable, the criminal act must be substantially similar in type to the previous criminal activities occurring on or near the premises so that a reasonable person would take ordinary precautions to protect his or her customers against the risk posed by that type of activity." (Citation

6

and punctuation omitted.) *Ratliff v. McDonald*, 326 Ga. App. 306, 312 (2) (a) (756 SE2d 569) (2014).

However, "[w]hile the prior criminal activity must be substantially similar to the particular crime in question, that does not mean identical"; rather, such activity "[must] be sufficient to attract the [owner's] attention to the dangerous condition which resulted in the litigated incident." (Citation and punctuation omitted.) *Sturbridge Partners, Ltd. v. Walker*, 267 Ga. 785, 786 (482 SE2d 339) (1997). "In determining whether previous criminal acts are substantially similar to the occurrence causing harm . . . , the court must inquire into the location, nature and extent of the prior criminal activities and their likeness, proximity or other relationship to the crime in question." Id. "[T]he question of reasonable foreseeability of a criminal attack is generally for a jury's determination rather than summary adjudication by the courts." (Citation and punctuation omitted.) Id.

Georgina presented evidence at trial of a number of prior crimes in or near Camelot Club, including, but not limited to, an armed robbery of a Camelot security guard at the front gate in January 2006; a battery and attempted robbery at the front gate in July 2006, which was reported to the security guard on duty; a robbery at gunpoint of a resident's guest inside the complex in June 2008, which was reported

7

to police and via phone message to Camelot; an attempted armed robbery of a resident inside the complex in June 2008; a robbery of a landscaper on Camelot Club property in September 2008, which was reported to Camelot; and a robbery of a resident in July 2009 after perpetrators drove unchallenged onto the property.

Additionally, Camelot's chief executive officer ("CEO") testified that Camelot received quarterly reports of criminal activity on the property from police, and he was personally aware of four incidents of armed robbery/aggravated assault on the property between April 2009 and the summer of 2010. He actually witnessed one of these incidents, in which a teenager fired shots at a resident, causing the CEO himself to duck behind a car to avoid being shot. The CEO testified that because Camelot Club had become "quite a bad place," Camelot hired Alliance, repaired the front gate, and took other security measures to address the situation.

We find that this and other evidence at trial was enough to support a finding by the jury that the prior criminal activity was sufficient to attract Camelot's attention to the dangerous condition that ultimately resulted in Emmanuel's murder and thus that the incident was reasonably foreseeable by Camelot. See *Sturbridge*, 267 Ga. at 786 (evidence of prior burglaries precluded summary judgment on premises liability claim arising out of rape); *Double View Ventures, LLC v. Polite*, 326 Ga. App. 555,

8

560 (1) (a) (757 SE2d 172) (2014) (jury question exists for purposes of apportionment of liability of gas station where evidence showed numerous armed robberies and assaults on station property prior to aggravated assault of plaintiff); *Bethany Group, LLC v. Grobman*, 315 Ga. App. 298, 301 (1) (a) (727 SE2d 147) (2012) (evidence of prior robberies and violence precluded summary judgment on premises liability claim arising out of subsequent murder).

(ii) *Superior knowledge* – Nevertheless, "[e]ven if an intervening criminal act may have been reasonably foreseeable, . . . the true ground of liability is the superior knowledge of the proprietor of the existence of a condition that may subject the invitee to an unreasonable risk of harm." (Citations, punctuation and emphasis omitted.) *Cook v. Micro Craft,* 262 Ga. App. 434, 438 (1) (585 SE2d 628) (2003). See also *Travis v. QuikTrip Corp.*, 339 Ga. App. 551, 553 (1) (794 SE2d 195) (2016) ("[I]t is well settled in Georgia that the fundamental basis for an owner or occupier's liability is that party's superior knowledge of the hazard encountered by the plaintiff.") (citation and punctuation omitted). Therefore, "[a] tenant will be precluded from recovery . . . as a matter of law against the landlord when he or she has equal or superior knowledge of the risk and fails to exercise ordinary care for his or her own

9

safety." *Brookview Holdings, LLC v. Suarez*, 285 Ga. App. 90, 97-98 (645 SE2d 559) (2007).

Although Camelot contends that the evidence did not support a finding that it had superior knowledge of the risk, it does not argue, and has failed to point us to any evidence in the record indicating, that Emmanuel had *any* knowledge of prior criminal activity at Camelot Club. Instead, Camelot argues that because the Assailants identified Emmanuel as a potential robbery victim at the parking lot where he purchased the electronics, the condition of the Camelot Club property cannot be considered the cause of the crime.[6] Pretermitting whether this argument addresses the issue of superior knowledge, it misapprehends the law in Georgia. The crime does not have to originate on the landowner's property in order to hold the owner liable. As this Court previously held,

> [w]hat matters is the foreseeability of the potential for a criminal act on the premises, *even if it began elsewhere*. . . . All that is required . . . is evidence that the particular danger which resulted in the assault on plaintiff . . . was foreseeable under all the circumstances and that the

---

[6] We note, however, Norris testified that although the three Assailants considered robbing Emmanuel at the parking lot and at the gas station, they decided against it because other people were present in these locales. In contrast, Camelot Club provided a better opportunity because it was not as wide open for witnesses to see the crime.

defendants were negligent in failing to exercise ordinary care to guard against it.

(Citation, punctuation, and emphasis omitted; emphasis supplied.) *McNeal v. Days Inn of America, Inc.*, 230 Ga. App. 786, 789 (498 SE2d 294) (1998) (denying summary judgment to premises owner on claims by plaintiffs who were attacked in hotel's parking lot by four men who followed them there from a nearby restaurant).[7] Accordingly, we find ample evidence to support the trial court's denial of Camelot's motion for directed verdict.

(b) *Nuisance* – Camelot asserts that the trial court erred in denying its motion for directed verdict on the nuisance claim, arguing third party crime can only constitute a nuisance if the landowner does nothing to prevent rampant crime on the

---

[7] The cases cited by Camelot to support this argument are inapposite as they involve cases in which the plaintiffs had a prior personal relationship with their attackers and knew of a specific threat posed by them. See, e.g., *Ratliff*, 326 Ga. App. at 306; *Hembree v. Spivey*, 281 Ga. App. 693 (637 SE2d 94) (2006); *Cook*, 262 Ga. App. at 435; *Johnson v. Holiday Food Stores, Inc.*, 238 Ga. App. 822 (520 SE2d 502) (1999); *Griffin v. AAA Auto Club South, Inc.*, 221 Ga. App. 1 (470 SE2d 474) (1996). Although Emmanuel had engaged in prior business dealings with one of the Assailants, the evidence indicated that he did not know the other two, and Camelot has pointed us to no evidence showing Emmanuel was aware of or had reason to suspect that any of the three posed a threat.

property whereas in this case Camelot hired Alliance. We disagree and find *Bethany Group, LLC v. Gorbman*, 315 Ga. App. at 301, directly on point.

In *Bethany*, the plaintiff brought claims for premises liability and private nuisance arising out of the death of her husband, a cab driver who answered a call at an apartment complex managed by the defendant. 315 Ga. App. at 298. The evidence in that case showed the apartment complex had experienced a series of crimes prior to the cab driver's death. Id. at 299. After noting that nuisance requires evidence that the defendant "created or maintained a continuous or regularly repeated act or condition on the property, which caused [the decedent's] injury," the Court held that the "ample evidence of repeated instances of armed robberies at [the complex established] a question of fact as to whether [the defendant] created or maintained a nuisance at the complex," without addressing the defendant's action or lack of action to address the problem. (Citation and punctuation omitted.) Id. at 302 (2). Compare *Barnes v. St. Stephen's Missionary Baptist Church*, 260 Ga. App. 765, 769 (2) (580 SE2d 587) (2003) (nuisance claim failed where the plaintiff presented no "evidence, other than of her own attack, that the building was currently and regularly being used for criminal activity of the kind that caused her injury").

12

Georgina, too, presented ample evidence at trial of prior criminal activities on the premises to support her claim of nuisance. Moreover, Camelot has not identified, and we have not found, any cases requiring a complete lack of action on the part of a property owner in order to establish a claim of nuisance. Accordingly, we find that the trial court properly denied Camelot's motion for directed verdict on the nuisance claim.

### *Apportionment*

2. Camelot argues that the trial court erred in entering judgment against it based on the fault apportioned to Alliance. Georgina counters that the judgment properly took into account that Camelot is vicariously liable for Alliance's actions under OCGA § 51-2-5 (4),[8] which imposes liability for an independent contractor's

---

[8] OCGA § 51-2-5 reads in pertinent part:

An employer is liable for the negligence of a contractor: . . .

(4) If the wrongful act is the violation of a duty imposed by statute;

(5) If the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference[.]

13

performance in connection with a statutory duty, such as the duty imposed by OCGA § 51-3-1, and OCGA § 51-2-5 (5) because it maintained or assumed control over the security guard employed by Alliance. In her cross-appeal, Georgina also asserts that the trial court erred in allowing the jury to apportion any fault to Alliance in the first place because OCGA § 51-12-33 (b) does not apply in cases of vicarious liability.

(a) *Waiver* – We first address whether Camelot and Georgina waived the errors that they now assert on appeal. Prior to trial, Georgina filed a motion in limine seeking to prohibit Camelot from denying that it had vicarious liability for the Alliance-employed security guard's actions in connection with the premises liability claim. At the hearing on the motion, Camelot asserted that it was not arguing as a matter of law that it was not liable for Alliance's actions because the security company was an independent contractor.[9] Rather, Camelot argued that because Alliance was a named party, the jury should be entitled to apportion fault to it. In fact, Camelot asserted that the jury could properly return a verdict apportioning 100 percent fault to Alliance. The trial court denied the motion in limine.

---

[9] Camelot asserted post-trial that this statement was confined to the premises liability claim, and indeed Georgina's motion in limine addressed only premises liability.

14

Georgina raised the issue of vicarious liability again at trial by moving to disallow any apportionment of fault, liability, or damages between Camelot and Alliance. Camelot's counsel countered, however, that an independent claim existed against Alliance for negligence, for which Camelot would have no vicarious liability. He argued that even if Georgina had not asserted a specific claim other than premises liability and nuisance, Camelot was free to argue alternative bases for finding Alliance independently liable. The trial court did not rule on this motion, because Georgina's counsel eventually agreed to a verdict form submitting the issue of apportionment to the jury.

Based on this record, we find that even if Camelot waived any argument that it is not liable under OCGA § 51-2-5 (4) for Alliance's actions on the statutory premises liability claim, it did not waive the issue of vicarious liability under OCGA § 51-2-5 (5).[10] Camelot argued that the evidence did not support a finding that it had the requisite control under that provision to impose liability for Alliance's actions, and significantly, Camelot asserted that the evidence supported a separate and

[10] Thus, even if the trial court abused its discretion in denying Georgina's motion in limine to exclude argument on vicarious liability as to the premises liability claim, the vicarious liability under OCGA § 51-2-5 (5) remained at issue. See *Chrysler Group*, __ Ga. App. at ___ (7) (abuse of discretion standard for motions in limine).

15

independent claim of negligence against Alliance as a party to this case. Therefore, we will consider Camelot's argument that the trial court erred in charging it with Alliance's portion of the jury award.

We reach the opposite conclusion as to Georgina's appeal from the denial of its motion at trial to disallow apportionment by the jury between Camelot and Alliance because Georgina's counsel ultimately agreed to the verdict form allowing apportionment. See *McKissick v. Aydelott*, 307 Ga. App. 688, 692 (1) (705 SE2d 897) (2011) ("[A] litigant cannot submit to a ruling or acquiesce in the holding, and then complain of the same on appeal."). See *Christie v. Rainmaster Irrigation, Inc.*, 299 Ga. App. 383, 391 (6) (b) (682 SE2d 687) (2009). However, we will consider and address Georgina's arguments in the context of Camelot's appeal on the apportionment issues.

(b) *Vicarious liability and apportionment* – Turning to the issue of whether the trial court properly entered judgment against Camelot based on the fault assigned to Alliance, we first consider the language of the apportionment statute, OCGA § 51-12-

16

33. Subsection (b) is the operative provision because this "action [was] brought against more than one person for injury to person or property."[11] In that event, the

> trier of fact, in its determination of the total amount of damages to be awarded, if any, shall . . . apportion its award of damages among the persons who are liable according to the percentage of fault of each person. Damages apportioned by the trier of fact as provided in this Code section shall be the *liability* of each person against whom they are awarded, shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution.

(Emphasis supplied.). This provision addresses liability, not merely fault, and by defining the liability of each person against whom damages are awarded and prohibiting joint liability, it seems generally to preclude any post-verdict reassignment of damages based on the jury's apportionment of fault.

Nevertheless, Georgina asserts that the post-verdict reassignment of damages was required because the apportionment statute does not apply to claims of vicarious liability, citing this Court's opinion in *PN Express, Inc. v. Zegel*, 304 Ga. App. 672

---

[11] OCGA § 51-12-33 (a) applies when an action is brought against one or more persons and the plaintiff is to some degree responsible for the injury or damages. Although Camelot argued at trial that Emmanuel should be put on the verdict form for apportionment purposes, the trial court denied that request, and Camelot has not asserted that issue on appeal.

17

(697 SE2d 226) (2010). In that case, the trial court declined a trucking company's request to charge the jury on apportionment of damages as between it and a third party, finding that the claims against the trucking company were based on derivative liability. *PN Express*, 304 Ga. App. at 678 (5). This Court affirmed, holding that "unless additional and independent acts of negligence over and above those alleged against the servant or employee are alleged against the employer, a verdict exonerating the employee also exonerates the employer." (Citation and punctuation omitted; emphasis supplied.) Id. That is because "[g]enerally, where a party's liability is *solely* vicarious, that party and the actively-negligent tortfeasor are regarded as a single tortfeasor." Id.

The question then is whether Georgina asserted claims against Camelot and Alliance that were solely vicarious in nature or whether there were additional and independent acts of negligence alleged against Alliance. Georgina's amended complaint in this case alleged negligence for failure to provide adequate security and in failing to keep the premises safe against the defendants without specifying the theories against each defendant and also asserted nuisance against Camelot and Homeside Properties. Likewise, the consolidated pretrial order listed Alliance as a party with a right to participate in the trial and described the claims against the

18

defendants collectively as failing to provide adequate security, failing to keep the premises safe, and maintaining a private nuisance. At trial, the jury was charged on the principles of common law negligence and undertaking a duty without specifying the theories of liability against the defendants, as well as nuisance. The jury was also generally charged on vicarious liability principles, and specifically that:

> Defendant, Camelot Club, the employer of independent contractors is liable for the acts and omissions of such independent contractor when the duty is imposed by statute. In this case the law imposes a personal and nondelegable duty upon defendant Camelot to use ordinary care to keep its premises and approaches safe.

We agree with Georgina that with respect to the premises liability claim, an owner or occupier's duties to keep the premises and approaches safe are statutorily delineated under OCGA § 51-3-1 and that those "duties are non-delegable even though the owner has a contract for another party to provide [the work]." (Citation and punctuation omitted.) *Johnson v. Clark*, 233 Ga. App. 508, 510 (504 SE2d 536) (1998). Moreover, under OCGA § 51-2-5 (4), "[a]n employer is liable for the negligence of a contractor . . . [i]f the wrongful act is the violation of a duty imposed by statute." Therefore, if the wrongful act were found to be a violation of Camelot's non-delegable, statutory duty, any negligence on the part of Alliance would be

19

charged to Camelot, and Camelot would be vicariously liable for Alliance's actions. See *Millard v. AAA Elec. Contractors &c.* 119 Ga. App. 548, 556 (3) (167 SE2d 679) (1969) (construing former version of OCGA § 51-3-1). See also *Lewis v. Nicholas Financial, Inc.*, 300 Ga. App. 888, 889-90 (686 SE2d 468) (2009) (construing non-delegable duty to repossess automobiles without a breach of the peace under OCGA § 11-9-609 (b) (2)).

However, neither common law negligence nor nuisance implicate a statutory duty. Although the General Assembly has passed laws addressing nuisance, OCGA § 41-1-1 et seq., such claims arise from the common law. See *State of Ga. v. Ball Investment Co.*, 191 Ga. 382, 389 (12 SE2d 574) (1940) (statutory definition of nuisance "was not intended to change the common-law definition of a nuisance"). Nuisance requires proof that a defendant "created or maintained a continuous or regularly repeated act or condition on the property," which led to the plaintiff's injury. (Citations and punctuation omitted.) *Bethany*, 315 Ga. App. at 302 (2). Here, the evidence showed a series of crimes on the Camelot Club property dating back to at least January 2006, over four years before Camelot hired Alliance to provide security for the property. Therefore, the jury could have found nuisance liability

arising from Camelot's actions, without regard to any actions by Alliance, and no issue of vicarious liability would arise in that circumstance.

Likewise, the jury could have imposed liability on Alliance independently for common law negligence arising out of its assumption of the duty to provide security. See *Kelley*, 230 Ga. App. at 509 (1) (even though the independent contractor may have no liability under OCGA § 51-3-1, it could breach an independent duty of failing to perform its work properly); *FPI Atlanta, LP v. Seaton*, 240 Ga. App. 880, 890 (524 SE2d 524) (1999) (physical precedent only) (Pope, J., concurring specially) (same). Thus, based on the jury instructions provided, the jury could have found liability because of Camelot's negligence (premises liability and common law negligence), Camelot's maintenance of a nuisance, Alliance's negligence in providing security, or some combination of these based on vicarious liability principles.

The closing argument of Georgina's counsel outlined the options available to the jury. Counsel told the jury that if they "put anything less than 100 percent next to Camelot Club, then those damages numbers are going to be reduced to that percentage. That's how the law works, and that's why they're on the verdict form." Significantly, with respect to the relationship between Alliance and Camelot, counsel argued:

21

[W]e think Alliance and Camelot are one in the same, but they want you to consider putting a number by them. That's why they're broken out here. They're jointly responsible. They're jointly liable under the law. *But if you can think of some way to separate out the wrongful conduct and those two parties, that's your prerogative.*

(Emphasis supplied.)

We cannot determine from the general verdict which of Georgina's claims the jury, in its prerogative, based its award.[12] See *Wolff v. Middlebrooks*, 256 Ga. App. 268, 271 (3) (568 SE2d 88) (2002) (court cannot determine claim upon which the jury imposed liability from a general verdict); *Crawford v. Johnson*, 227 Ga. App. 548, 550 (1) (489 SE2d 552) (1997) (same). It is entirely possible that the jury did not base its verdict on a breach of Camelot's duty of care under OCGA § 51-3-1.[13] Instead, the jury may have imposed fault on Camelot based strictly on a theory of nuisance, and the imposition of fault on Alliance under common law negligence could be completely independent of, and not imputable to, Camelot. See *Crawford*, 227 Ga.

---

[12] The verdict simply stated that the jury found for Georgina and awarded $1,250,000 to her as the personal representative for Emmanuel's estate and $2,000,000 for the full value of Emmanuel's life, before allocating fault.

[13] Even though we found in division 1 (b) that the evidence supported a finding that Emmanuel's death was reasonably foreseeable based on prior criminal activity on the property, the jury may not have reached such a conclusion.

22

App. at 550 (1) (court could not determine liability for contribution or indemnity from general verdict where only some, but not all, of claims asserted would support such an award).

Therefore, we find that the trial court erred in imposing liability on Camelot for Alliance's share of fault. "The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict." (Citation omitted.) *Harris v. Tutt*, 306 Ga. App. 377, 378 (1) (702 SE2d 707) (2010). See also *Kerr v. Callaway*, 102 Ga. App. 653, 653 (117 SE2d 243) (1960) ("There is a duty to uphold the verdict if it can be supported by any reasonable view by the evidence.").

Accordingly, we vacate the portion of the trial court's judgment imposing vicarious liability on Camelot, and we remand this case for the trial court to enter judgment in accordance with the jury's verdict.

*Judgment affirmed in part and vacated in part; case remanded with direction in Case No. A16A2069. Judgment affirmed in Case No. A16A2070. Barnes, P. J., and McFadden, P. J., concur.*